**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Kathy S. Eldred, | : | Case No. 3:09CV1393 |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM OPINION** |
| | | **AND ORDER** |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

The parties have consented to have the undersigned Magistrate enter judgment in this case. Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. §§ 416 (i) and 423.  Pending are the parties' Briefs on the merits (Docket Nos. 17 and 20) and Plaintiff's Reply (Docket No. 21).   For the reasons set forth below, this case is remanded to the Commissioner pursuant to Sentence Four of 42 U. S. C. § 405(g).

**I. JURISDICTION**

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## II. PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB on August 15, 2005, alleging that she was unable to work because of her disabling condition on June 7, 2005 (Tr. 83-85)  The claim was denied initially and upon reconsideration (Tr. 72-74, 69-70).  Plaintiff made a timely request for hearing (Tr. 67).  Plaintiff, represented by counsel, and Joseph L. Thompson, a Vocational Expert (VE), appeared at hearing held on March 10, 2005, before Administrative Law Judge (ALJ) Bryan J. Bernstein (Tr. 477).  On July 28, 2008, the ALJ rendered an unfavorable decision finding that Plaintiff was not entitled to a period of disability or DIB (Tr. 12-27).  The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner (Tr. 2-4).

## III. FACTUAL BACKGROUND

At the time of the administrative hearing, Plaintiff  was 48 years old. And weighed 303 pounds. Plaintiff claimed that she slept twenty hours daily.  She was awake long enough to eat one meal.  This procedure caused her to gain weight (Tr.477,  484).  Recently she had changed her eating habits to include five to six small meals daily (Tr. 485).

Plaintiff's past relevant work included employment in the "return" department at the Lucinda Bassett Center for Stress and Anxiety (Tr. 483).  She was employed at Davis-Besse as an administrative assistant in service processing from November 2004 to April 2005 (Tr. 512, 513).  Plaintiff worked two days in June 2005.  She hurt so badly that her co-workers had to help her get out of her chair and to her car (Tr. 527).

Plaintiff was diagnosed with and treated for symptoms relating to fibromyalgia, a medical disorder characterized by widespread pain.  Plaintiff alleged that the pain permeated her body (Tr. 486, 524). Although there was no diagnostic evidence of the disease, Plaintiff's physician used treatments

2

designed for the treatment of fibromyalgia to address her symptoms (Tr. 486, 523)

Plaintiff was diagnosed with trigeminal neuralgia, a disorder characterized by episodes of intense pain in one's face, specifically, Plaintiff's head, ears, chin and eyes hurt (Tr. 486, 487).  The prescribed medication was designed to reduce the intensity and frequency of spasms in her face (Tr. 486).

Plaintiff was diagnosed with bradycardia, a slow heart beat.  While seated or lying down, Plaintiff's pulse dropped.  She wore a nasal cannula to deliver a supplemental supply of oxygen to enhance her airflow (Tr. 489).

Plaintiff had asthma, an inflammatory disorder of the airways.  Perfumes, irritants, some plants and stress were causes for an attack (Tr. 519).  She was prescribed Nasonex, Advair and a nebulizer to minimize the symptoms (Tr. 488, 517).  In addition, Plaintiff was susceptible to chronic bronchitis.  The main air passages to the lung would become blocked approximately four times per year (Tr. 516).

Plaintiff was diagnosed with Achilles tendinopathy (Tr. 491-492).  Her feet hurt on the bottom and she experienced spasms in her calves that she described as a "Charley horse gone wild."  The worse spasm lasted up to an hour.  A muscle relaxant was prescribed to relieve the pain.  The side effect of the muscle relaxant was drowsiiness (Tr. 493).

Plaintiff suffered from nerve damage in her back.  She experienced sudden loss of feeling from her waist down.  Plaintiff recalled that this happened twice and both times she fell (Tr. 504, 506).

Plaintiff had problems with the discs in her neck.  The pain and numbness radiated down from her shoulder to her left arm into her fingers.  Her fingers then cramped (Tr. 515).

Apparently Plaintiff had been treated for depression.  She was prescribed Cymbalta®, a medication used to treat depression anxiety.  Plaintiff had been in therapy but she was unable to pay her bill so the counseling sessions had been suspended (Tr. 520).  Now she was involved in talk therapy

through the Giving Tree (Tr. 522).

Plaintiff could drive when she was not taking her medication (Tr. 496). However, she could only drive ten minutes without stopping (Tr. 497). Plaintiff cooked occasionally using the oven, stove top, crock pot or microwave (Tr. 500). Generally, Plaintiff shopped at Walmart and IGA with the assistance of her son or spouse (Tr. 501).

The ALJ posed a hypothetical question to the VE that included, in part, the requirement that permitted flexibility in production and a sit/stand option but no close regimentation of production, no close or critical supervision, no work responsibilities demanding constant manipulation involving fine work, gripping, grasping or twisting and no work in atmospheric concentrations of dust, smoke, and chemical fumes or temperature and humidity extremes (Tr. 528, 529). These limitations would preclude any of Plaintiff's past relevant work. However, these limitations would not preclude other work of a light, unskilled nature with an ability to sit and stand. The jobs that would accommodate these limitations include cashier, "shipping and receiving ware" and production inspector. There are approximately 1,500 cashier jobs, approximately 200 shipping and receiving jobs and approximately 500 production inspector jobs in the Northwest Ohio labor market (Tr. 529, 530).

Plaintiff could not be around moving machines because the vibrations triggered headaches. This inclusion in the hypothetical would limit the hypothetical claimant to less than a full range of sedentary activity (Tr. 533). If the hypothetical claimant were right hand dominant and could not use his or her left hand for fine manipulation or grasping and pushing and pulling, it would not affect the positions identified (Tr. 534, 535).

4

## IV. MEDICAL EVIDENCE

On January 7, 1999, Dr. Robert S. Sawicki found soft tissue swelling without evidence of acute bone or joint abnormality (Tr. 436).

The acute abdominal series test administered on February 24, 1999, showed no acute cardiopulmonary disease and no evidence of an acute abdominal condition (Tr. 435).

On March 19, 1999, Plaintiff underwent a computed tomographic (CT) scan of her abdomen and pelvis. The results were negative. Multiple sigmoid diverticula were detected in the pelvis (Tr. 434).

Plaintiff was diagnosed with gastrointestinal reflux on April 8, 1999 (Tr. 433).

On January 19, 2000, Dr. Daniel G. Cadigan, a family practitioner, addressed Plaintiff's complaints of intermittent headaches by prescribing Antivert and Naproxyn (Tr. 373, 374). The results from the CT scan of Plaintiff's head, administered on January 28, 2000, were unremarkable (Tr. 432). In February the headaches had improved (Tr. 372). In April, the headaches had recurred. Tylenol #3 was prescribed (Tr. 371). In November, the Tylenol was replaced with Tegretol (Tr. 370).

In February 2001, Plaintiff's headaches had improved (Tr. 368). By May, the headaches had decreased in severity and frequency (Tr. 366).

The magnetic resonance imaging (MRI) of Plaintiff's head, administered on March 14, 2001, showed no evidence of abnormal masses or enhancements. There was a small cyst present along the posterior aspect of the left maxillary sinus (Tr. 429). The MRI of Plaintiff's cervical spine, administered on March 14, 2001, showed small central C5 disc protrusion which effaced the ventral subarachnoid space and appeared to cause a minimal amount of flattening along the ventral aspect of the traversing cord (Tr. 430).

On October 19, 2001, Plaintiff suffered a left ankle injury. There was considerable edema

5

medically and laterally.  It was suspected that there was a tiny avulsion fracture of the tip of the lateral malleolus (Tr. 428).

On November 2, 2001, Plaintiff complained of heel pain.  Dr. Cadigan referred her to a podiatrist (Tr. 361).

On December 4, 2001, Plaintiff complained of right leg pain (Tr. 360).  There was no evidence of deep venous thrombosis of the right lower extremity (Tr. 426).  On December 10, 2001, Plaintiff presented for treatment of cellulitis.  The cellulitis was resolved but Plaintiff's asthma was exacerbated and her left leg showed signs of possible deep venous thrombosis (Tr. 359).  On December 11, 2001, Plaintiff had chest pain.  The views of the chest showed minimal left basilar linear fibrosis and/or lack of gas exchange within the alveoli (Tr. 425).

On February 18, 2002, Plaintiff was treated for hip pain.  Dr. Cadigan prescribed drug therapy followed by physical therapy if drug therapy were unsuccessful  (Tr. 358).  On March 5, Plaintiff complained of knee pain.  The lumbar radiculopathy had improved (Tr. 357).  In April 2002, Dr. Cadigan assessed Plaintiff's medical condition and found that she had lumbar radiculopathy and hip pain (Tr. 286).  In early May 2002, Dr. Cadigan noted that physical therapy was helping (Tr. 284).  Later in May 2002, Dr. Cadigan explained the MRI scan showed possible nerve impingement on the left due to bone spurs, degenerative disc disease with mild canal narrowing and foraminal encroachment by end plate ridging (Tr. 283, 422).

At Dr. Cadigan's request, Dr. Edmund P. Lawrence, a neurologist, conducted a neurological examination of Plaintiff on June 20, 2002, and reviewed her diagnostic studies.  The x-ray studies of the spine showed two areas of degenerative collapse at L4-L5 and L5-S1 with modest spinal stenosis, worse on the left (Tr. 266).

6

The results from the x-ray administered on July 4, 2002, showed a normal chest (Tr. 420).  The MRI of Plaintiff's left shoulder, administered on September 9, 2002, showed a mild chronic rotator cuff tendinopathy with no evidence of a tear (Tr. 419).

On October 28, 2002, Dr. Cadigan noted that Plaintiff was awaiting worker compensation commissioner approval for neurosurgerical intervention.  On this date, he provided symptomatic treatment for a viral upper respiratory infection (Tr. 280).

The results from the x-ray of Plaintiff's chest, administered on November 27, 2002, showed no evidence of acute cardiopulmonary disease or change since the July 4th chest x-rays (Tr. 417).  Plaintiff was prescribed an antibiotic for a mild rash on December 10, 2002 (Tr. 352).

On March 28, 2003, Dr. Cadigan diagnosed Plaintiff with trigeminal neuralgia.  He continued the prescription for a pain reliever that she had taken to relieve the headaches (Tr. 351).  The results were unchanged on April 9, 2003 (Tr. 350).  The results of the x-ray of Plaintiff's head administered on April 14, 2003, were negative (Tr. 415).  However, the symptoms of trigeminal neuralgia showed signs of deterioration on April 30 and May 16, 2003.  In May,  Dr. Cadigan noted the onset of depression (Tr. 348, 349).  In August 2003, Dr. Cadigan prescribed medication for the treatment of sinusitis and for the relief of congestion associated with asthma.  Plaintiff's headaches had improved (Tr. 346).  As of September 17, 2003, Plaintiff's asthma was stable (Tr. 344).  In October, Dr. Cadigan addressed swelling in Plaintiff's legs and shortness of breath (Tr. 343)

Dr. Stephen Benedict, a clinical neurophysicologist, treated Plaintiff in July, August and September 2003 for chronic daily headaches.  He prescribed an antidepressant and increased medication designed to control seizures (Tr. 272).  In August, Plaintiff expressed a desire to use over-the-counter medication (Tr. 271).  In September, the neurological examination results were normal; however, Dr.

7

Benedict suspected obstructive sleep apnea (Tr. 270).

The CT scan of Plaintiff's head ordered on July 7, 2003, showed no evidence of abnormality (Tr. 267).  The results from the electroencephalograph, administered on July 24, 2003, were within normal limits (Tr. 414).

In October 2003, the results of the myocardial perfusion scan showed evidence suggestive of ischemia (Tr. 409).  The stress electrocardiographical report resulted in no exercise induced angina or electrocardiogram changes suggestive of ischemia (Tr. 408).

In November 2004, Plaintiff underwent testing to measure the saturation of oxygen in her blood. During the eight-hour period, the test measured fourteen desaturation events more than three minutes in duration.  There were 69 events of desaturation that lasted less than three minutes duration (Tr. 400).

Upon undergoing an ultrasound of her abdomen, two large gallstones were discovered on April 7, 2005 (Tr. 399).  On April 15, 2005, Plaintiff consulted with Dr. G. V. Crisologo, a general surgeon, regarding the presence of gallstones.  Dr. Crisologo confirmed the diagnosis and conducted an upper gastrointestinal endoscopy on August 30, 2005 (Tr. 292, 302).

In the interim, the results from the electrocardiogram administered on April 21, 2005, showed a bout of sinus arrhythmia (Tr. 396).  When repeated on August 24, 2005, the electrocardiogram results showed no acute process (Tr. 393).

On November 2, 2005, Dr. Jon Starr, a medical consultant, opined that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday (Tr. 314).  Plaintiff could occasionally climb using a ramp, stairs, ladder/rope/scaffold, balance and crouch (Tr. 315). Plaintiff had no manipulative, visual, communicative or environmental limitations (Tr.

8

316, 317).  Mr. Starr opined that Plaintiff's statements were partially credible but inconsistent with the severity and validity of allegations (Tr. 318).

In January 2006, Dr. Cadigan noted the presence of nocturnal hypoxemia (Tr. 325).

On April 17, 2006, Dr. Cadigan opined that Plaintiff could lift and/or carry ten pounds occasionally and five pounds frequently, Plaintiff could stand/walk four hours in an eight-hour workday, stand/walk one fourth hour without interruption in an eight-hour workday, occasionally stoop, crouch, bend or kneel, reach, handle, feel, see and hear (Tr. 456, 457).  Because Plaintiff had asthma and she was prescribed a narcotic equivalent, Dr. Cadigan determined that Plaintiff could not be around heights, moving machinery, temperature extremes, chemicals, dust, noise or humidity (Tr. 457-458).  In his opinion, Plaintiff was incapable of working (Tr. 458).

In the supplemental physical capacity evaluation form completed by Dr. Cadigan on April 17, 2006, he opined that a sit/stand option was not practical as Plaintiff required complete freedom to rest but she did not require time to lie down during the day.  It was expected that Plaintiff would be absent five or more days monthly; thus, she would be an unreliable worker (Tr. 459).

In August 2006, Dr. J. Burns, interpreting the non-contrast MRI of the lumbar spine, found a right para-central lateral disc protrusion and L4-L5 and bony foraminal encroachment (Tr. 421).

Plaintiff consulted with Dr. Dale E. Braun, M.D., a neurosurgeon, on September 25, 2006.  He concluded that surgical intervention should be considered, albeit carefully.  He also recommended that Plaintiff obtain another medical opinion (Tr. 462).

Plaintiff obtained a prescription for foot plates on November 13, 2007 (Tr. 463).  On November 29, 2007, Plaintiff underwent a neuropsychological evaluation.  Dr. Timothy F. Wynkoop, Ph.D., administered a bevy of tests, including but not limited to, the Mini Mental State Examination, the

9

Wechsler adult Intelligence Scale-III, the Reading Subtest from the Wide Range Achievement Test–3, the Hopkins Verbal Learning Test, the Grooved Pegboard Test, and the Personality Assessment Inventory (Tr. 465).  There was no evidence of cognitive impairment and Plaintiff's full scale intelligence quotient fell in the average to high average range (Tr. 466).  Plaintiff articulated a lot of depression (Tr. 467).  In summary, Plaintiff demonstrated variable attention, weak copy of a complex figure, slow phonemic fluency, weak alphanumeric processing, and defectively weak grip of strength bilaterally (Tr. 467).  Dr. Wynkoop compiled a working diagnosis of cognitive disorder, depression, and a tendency to overly focus on health related concerns (Tr. 468).

Dr. Molly S. Judge, a podiatrist, confirmed the diagnosis of Achilles tendinopathy.  In addition, she diagnosed Plaintiff with gastroc soleal equinus bilaterally, tibialis posterior tendon dysfunction, rear foot varus bilaterally, and chronic venous stasis.  The treatment plan included a night splint (Tr. 475).

On December 5, 2007, Dr. Joel Rosner determined that Plaintiff had moderate chronic distal Achilles tendinosis, Haglund Syndrome (a condition when retrocalcaneus bursitis exists at the same time as Achilles tendinitis), mild/moderate chronic proximal plantar fasciitis, and scarring of the deep and superficial fibers of the deltoid ligament (Tr. 471, www.medcyclopaedia.com).

### V. STANDARD FOR ESTABLISHING DISABILITY

To be entitled to disability insurance benefits, an individual must be under a disability within the meaning of the Act.  *Rabbers v. Commissioner Social Security Administration*, 582 F.3d 647, 651 -652 (6th Cir. 2009) (*citing* 42 U.S.C. § 423(a)(1)(E)).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for

a continuous period of not less than 12 months." *Id.* (*citing* 42 U. S. C. § 423(d)(1)(A)).

The Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(a)). If the claimant is found to be conclusively disabled or not disabled at any step, the inquiry ends at that step. *Id.*

The five steps are as follows:

(1)     If the claimant is doing substantial gainful activity, the claimant is not disabled.

(2)     If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.

(3)     If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

(4)     If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

(5)     If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Id.* (*citing* 20 C. F. R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g); *see also Cruse v. Commissioner of Social Security,* 502 F.3d 532, 539 (6th Cir.2007); *Walters v. Commissioner of Social Security,* 127 F.3d 525, 529 (6th Cir. 1997)). The claimant bears the burden of proof through step four; at step five, the burden shifts to the Commissioner. *Id.*(*citing Jones v. Commissioner of Social Security,* 336 F.3d 469, 474 (6th Cir. 2003)).

## VI. THE ALJ'S FINDINGS

The ALJ made the following findings:

1.     Plaintiff met the insured status requirements of the act through December 31, 2009.

2.     Plaintiff had not engaged in substantial gainful activity since July 7, 2005, the alleged

11

onset date of disability. Plaintiff had severe impairments as defined in at 20 C.F.R. § 404.1520(b). However, Plaintiff's impairments were not so severe as to meet or equal the criteria of the impairments listed in 20 C. F. R. Part 404, Subpart P, Appendix 1.

3.     Plaintiff was not reliable.

4.     Plaintiff had the RFC to perform a restricted range of work activity which included lifting twenty pounds occasionally and ten pounds frequently, carrying no more than ten pounds occasionally and five pounds frequently. Relevant employment required a sit/stand option and Plaintiff's impairments prevented her from standing and walking longer than 50 percent of an eight-hour workday.

5.     Plaintiff could not perform any of her past relevant work. Plaintiff was a younger individual aged 18 to 49,with at least a high school education and the ability to communicate in English.

6.     There were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

7.     Plaintiff was not under a disability as defined in the Act at any time through the date of the decision on July 28, 2008.

(Tr. 14-27).

## VII. STANDARD OF REVIEW

Judicial review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security,* 348 F.3d 124, 125 (6th Cir. 2003) (*See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)). The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision. *Id.* The terms "substantial evidence" has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Ealy v. Commissioner of Social Security,* 594 F.3d 504, 512 (6th Cir. 2010) (*citing Lindsley v. Commissioner of Social Security,* 560 F.3d 601, 604 (6th Cir. 2009) (*quoting Richardson v. Perales,*

91 S. Ct. 1420, 1427 (1971)).

## VIII. ISSUES PRESENTED

(1)     Did the ALJ properly analyze the opinions of the long-term treating physician, Dr. Cadigan?

(2)     Are the ALJ's finding concerning credibility and pain supported by substantial evidence.

(3)     Is the ALJ's finding at Step 5 of the sequential evaluation supported by substantial evidence?

## IX. PLAINTIFF'S POSITION.

First, Plaintiff contends that the ALJ concentrated on evidence that supported an adverse decision. He ignored evidence that would have supported a finding that she was disabled.

Second, the ALJ's credibility finding is based on inconsistencies in the evidence.

Third, the ALJ never asked the VE to consider whether a person of Plaintiff's age, education or work experience could perform other work.

## X. DEFENDANT'S POSITION

Defendant's first contention is that the ALJ properly analyzed Dr. Cadigan's opinions.

Second, Defendant argues that there is substantial evidence to support the ALJ's adverse credibility finding.

Finally, Defendant contends that substantial evidence supports the ALJ's step five finding that Plaintiff retained the capacity to perform a significant number of light level jobs in the national economy.

## XI. DISCUSSION.

1.     **ANALYSIS OF DR. CADIGAN'S OPINIONS**.

In her first assignment of error, Plaintiff suggests that the ALJ failed to give good reasons for

13

failing to give controlling weight to Dr. Cadigan's opinion that she will need complete freedom to rest as needed and would likely miss five days of work a month or more due to her impairments.  The ALJ erred by accepting part of the judgment of the treating physician while simultaneously rejecting other parts without articulating a reason for rejection.

Generally, the opinions of treating physicians are given substantial, if not controlling, deference. *Warner v. Commissioner of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004) (*citing King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); 20 C.F.R. § 404.1527(d)(2) (2004)).  Treating physicians' opinions are only given such deference when supported by objective medical evidence.  *Id*. (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)).  Opinions of treating physicians are given great weight even if those opinions are deemed not to be controlling.  *White v. Commissioner of Social Security,* 572 F.3d 272, 286 (6th Cir. 2009) (*citing* S.S.R. 96-2p).

ALJs must articulate good reasons for not giving the opinions of a treating physician controlling weight.  *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations, specifically, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.  20 C. F. R. § 404.1527(d) (Thomson Reuters 2010).

The ALJ did refer to Dr. Cadigan's medical assessment and its supplement (Tr. 24).  However, he did not adopt Dr. Cadigan's opinions that Plaintiff needed unlimited rest throughout the workday or that she would likely miss work more than five times monthly.  The ALJ contends that he considered Dr. Cadigan's opinions in accordance with the requirements of 20 C. F. R. § 404.1527.  Interspersed

14

throughout his decision as a whole are the ALJ's explanations of why he rejected Dr. Cadigan's observations. Dr. Cadigan determined that Plaintiff could stand and/or walk for one fourth hour, without interruption, for a total of four hours total and sit for one hour, without interruption, for a total of six hours. The ALJ found that Dr. Cadigan's opinion about the need to rest or miss work was speculation, not a medical judgment. The ALJ fully satisfied agency procedural requirements by giving good reasons for discounting Dr. Cadigan's questionnaire response.

## 2.  CREDIBILITY

Plaintiff challenges the ALJ's credibility determination on several bases. First, the ALJ failed to consider Plaintiff's pain log in assessing credibility. Second the ALJ failed to acknowledge that there was objective medical evidence to support a finding that Plaintiff had nerve damage in her back. Third, the ALJ's observations at trial were embellished. Defendant claims that there is sufficient evidence in the record to support an adverse credibility finding.

The ALJ, not the reviewing court, evaluates the credibility of witnesses, including that of the claimant. *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 247 (6th Cir. 2007) (*citing Walters, supra*, 127 F.3d 52 at 531; *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 538 (6th Cir. 1981)). However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Id.* (SOC. SEC. RUL. 96-7p, 1996 WL 374186, at * 4). Rather, such determinations must find support in the record. *Id.* Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.* The entire case record includes any medical signs and lab findings, the claimant's own complaints of

15

symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. *Id.* Consistency of the various pieces of information contained in the record should be scrutinized. *Id.* at 247-248. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.* at 248.

SSR 96-7p also requires that the ALJ explain his or her credibility determinations in his or her decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id*. In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence. *Id*. It is well established that credibility determinations with respect to subjective complaints of pain rest with the ALJ. *See Sisterlet v. Secretary of Health & Human Services*, 823 F. 2d 918, 920 (6th Cir. 1987).

When evaluating credibility, the ALJ considered Plaintiff's subjective complaints of pain and found that Plaintiff had impairments that were the source of debilitating pain. The pain, however, was not of the severity that Plaintiff alleges. The exhaustive list of Plaintiff's subjective complaints of pain are recapitulated in her testimony. The Magistrate is not persuaded that the ALJ's determination of credibility was made exclusive of the entries made in the pain logs.

The ALJ found that Plaintiff was less than forthright during the hearing process. This finding is based solely on the ALJ's observation of Plaintiff's demeanor and actions during the hearing. Under the regulations, the ALJ has a duty to observe a witnesses demeanor during the hearing. Since the ALJ complied with the agency regulations in discounting Plaintiff's credibility, an issue reserved to the

16

Commissioner, the Magistrate does not disturb this finding.

Plaintiff claims that the adverse credibility finding was based, in part, on the ALJ's determination that her allegations of "nerve damage" were not supported by objective medical evidence. The MRI to which Plaintiff referred indicates disc herniation, compression of the nerves and radiculopathy. All of these impairments affect the nerve root. The ALJ acknowledged that the nerves were affected but he did not find that any of the treating or examining physicians found nerve impingement. The ALJ properly discounted Plaintiff's testimony that she had nerve root damage as it was not supported by objective medical evidence.

### 3.   THE HYPOTHETICAL QUESTION.

Plaintiff claims that this case should be remanded as the responses of the VE did not consider age, education and work experience. Such consideration is required.

In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. *Ealy, supra*, 594 F.3d at 516 (*See Howard v. Commissioner of Social Security*, 276 F.3d at 239, 241 (6th Cir.2002); *see also Webb v. Commissioner of Social Security*, 368 F.3d 629, 633 (6th Cir. 2004) (though an ALJ need not list a claimant's medical conditions, the hypothetical should provide the vocational expert with ALJ's assessment of the what the claimant "can and cannot do"). The hypothetical must examine four essential factors: (1) claimant's age; (2) claimant's education; (3) claimant's past work experience; and (4) claimant's residual functional capacity. 20 C.F.R. § 404.1505(a) (Thomson Reuters 2010).

In this case, Defendant contends that this error is harmless because the ALJ referred to the Grids as a guideline for determining the range of available work. The Magistrate notes that the grids do take

17

into account, the claimant's age, education, experience and RFC. Reliance on the grids in the presence of the non-exertional limitations in this case was not appropriate. At least one of the questions posed to the VE failed to examine the four essential factors of age, education, past work experience and RFC as required under 20 C.F.R. § 404.1505(a). In both instances, the ALJ failed to find the availability of other work that Plaintiff can perform. The case is remanded to the ALJ for consideration of evidence as to whether an accurately portrayed Plaintiff can perform the range of work permitted by her exertional and non-exertional limitations.

## XII. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is reversed and the case is remanded to the Commissioner, pursuant to Sentence Four of 42 U. S. C. § 405(g) to hear testimony from the VE regarding the range of jobs available to Plaintiff as contemplated at Step Five of the sequential evaluation.

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date: September 23, 2010

18